RALPH W. LAVAT, Plaintiff-Appellant, v. FRUIN COLNON CORPORATION *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—91—1570

Opinion filed July 31, 1992.

Leonard M. Ring & Associates, P.C., of Chicago (Leonard M. Ring and Margaret A. McGuire, of counsel), for appellant.

John B. Lashbrook and Diane Karp, both of Conklin & Roadhouse, of Chicago, for appellees.

JUSTICE LaPORTA* delivered the opinion of the court:

Plaintiff Ralph W. Lavat appeals the dismissal by summary judgment of his two-count complaint for libel and retaliatory discharge filed against defendants Fruin Colnon Corp., McCartin-McAuliffe Me-

---

*Justice LaPorta authored this opinion before her death.

chanical Contractor, Inc., Kelso Burnett Co. and Power Systems, Inc., doing business as Baldwin Associates, a partnership (Baldwin).

Baldwin contends that Lavat was fired from its nuclear power plant construction project for lying on his resume with regard to the education he received from American University in Washington D.C. and the Cleveland Institute of Electronics. Lavat contends that his resume is truthful in all material aspects and that he was libeled by Baldwin when Baldwin informed the Bureau of Employment Security, Division of Unemployment Insurance (Unemployment Division), that Lavat was fired for "falsification of employment records." Lavat sought damages for retaliatory discharge contending that he was fired because he went to the Nuclear Regulatory Commission (NRC) with concerns about being pressured to "sign off" on safety documentation.

On appeal the plaintiff raises as issues: whether, under the innocent construction rule, the statement "falsification of employment records" may be innocently construed when that statement is given as the reason for discharge and the employee is ineligible for rehire, and whether a genuine issue of material fact exists with respect to the motive of the employer when it fired the plaintiff.

The majority of the facts of this case are not in dispute.

On May 13, 1986, Ralph Lavat filed an amended complaint at law against Baldwin alleging one count of libel and one count of retaliatory discharge. The complaint contended Lavat was hired July 5, 1983, as a quality assurance document review engineer and that he was promoted from time to time for faithfully performing his duties. The complaint alleged that in April 1984 Lavat reported to the NRC violations by Baldwin of NRC codes, standards and regulatory requirements. Plaintiff alleged that "[s]ometime thereafter BALDWIN learned that the NRC found it in violation of certain document control procedures and that the plaintiff was the source of the report to the NRC. On August 27, 1984, the plaintiff's employment was terminated by BALDWIN."

Plaintiff alleged that as a pretext for his firing Baldwin claimed plaintiff had falsified his employment application when in fact the "application was true in every material respect." Plaintiff alleged that he was libeled when, in September of 1984, Baldwin composed and caused to be published to the Unemployment Division a statement that plaintiff had been fired for "falsification of employment records."

Plaintiff alleged that the statement was libelous because it was false in fact and malicious in intent and published by Baldwin with knowledge of its falsity. Plaintiff also alleged, "on information and be-

lief, BALDWIN, published said statement to prospective employers with knowledge of falsity or a reckless disregard of its truth of [*sic*] falsity."

Plaintiff alleged that he suffered damage to his reputation and good name and was brought into public disgrace and scandal. He alleged he was prevented from gaining other employment, or employment at a comparable salary and has been "ostracized in the industry."

In the retaliatory discharge count, plaintiff alleged he was hired by Baldwin because he possessed the educational qualifications and prior work experience required for the job. Plaintiff alleged that "plaintiff became aware of certain practices by BALDWIN in collusion with the NRC's licensee, Illinois Power Company, and in violation of the said codes, standards, and regulatory requirements, including numerous requests by his superiors to certify procurement documents which in fact lacked sufficient underlying data to permit certification." Plaintiff alleged that he reported his findings to the management of Baldwin and informed the NRC of the illegal practices in April of 1984.

Plaintiff alleged that he was fired in August of 1984 despite the fact that three other document reviewers "whose work was of the same quality as plaintiff and whose educational level was the same or less than that of plaintiff" were allowed to resign.

Plaintiff alleged that the reason given for his firing, "falsification of employment records," was pretextual and in retaliation for his reporting Baldwin to the NRC and his refusal to certify inappropriate procurement documents. Plaintiff further alleged that his firing was in violation of public policy.

Baldwin filed an answer and then an amended answer with four affirmative defenses. In response to the libel count, Baldwin admitted that it hired plaintiff as a document reviewer, that he performed his job satisfactorily and was promoted on one occasion. Baldwin admitted that it was informed in April of 1984 of plaintiff's contact with the NRC and that plaintiff was discharged in August for falsification of employment records. Baldwin admitted that in September 1984 it communicated to the Unemployment Division that plaintiff had been discharged for falsification of employment records.

Baldwin alleged three affirmative defenses to the libel count: (1) the statement "falsification of employment records" was true; (2) the communication by Baldwin to the Unemployment Division was absolutely privileged pursuant to section 1900 of the Unemployment Insur-

ance Act (Ill. Rev. Stat. 1989, ch. 48, par. 640); and (3) the communication was conditionally privileged under common law.

In response to the retaliatory discharge count, Baldwin admitted that it certified plaintiff for certain positions prior to a completion of all background checks and that three employees who had not been properly certified did resign from Baldwin. Defendant admitted that plaintiff was fired for falsification of employment records. As an affirmative defense, Baldwin contended that it is against public policy to permit an unqualified individual from bringing a wrongful discharge action as a result of his discharge from a certified position as a quality assurance employee at a nuclear facility.

In May of 1990, defendant moved for summary judgment, contending that Lavat was fired because he lied on his resume and not in retaliation for anything Lavat had done. Baldwin contended that Lavat was not libeled because the statement to the Unemployment Division was both privileged and true.

Baldwin also pointed out that Lavat previously had filed a libel action against Baldwin in another county and in that action admitted that his resume was false. Lavat voluntarily dismissed that action on August 9, 1985, and then filed his first complaint in Cook County, which was subsequently amended.

Baldwin contended that it fired Lavat for valid, nonpretextual and nonretaliatory reasons. Baldwin attached to its motion the affidavits of three people, two who were Lavat's superiors and involved in his firing and the third, a woman conducting the educational audit.

Larry W. Osborne, Baldwin's manager for quality and technical services at the Clinton Power Station, swore by affidavit that he was responsible for all quality assurance and quality engineering activities. He was the liaison between Illinois Power and the NRC with regard to inspections and reports. He stated that he was responsible for assuring that people under his charge were free from intimidation and would suffer no retaliation for raising safety concerns with the NRC.

He stated that Baldwin policy provided three avenues for quality assurance inspectors to voice their concerns over potential safety problems: (1) Baldwin supervisors and management; (2) Illinois Power's "Safe Team," a confidential hotline; and (3) unrestricted access to the NRC, including an on-site office.

He stated that no employee, including Lavat, was ever fired in violation of the Energy Reorganization Act of 1974 (the ERA) (42 U.S.C. §5851(a) (1988)). The ERA forbids an employer from discharging an employee or otherwise discriminating against the employee because the employee pursued a complaint either through the ERA or

the Atomic Energy Act of 1954, both governing nuclear power plant construction and operations.

Osborne stated that Lavat initially was assigned to the document review group of quality assurance as a document reviewer and later to quality engineering as a quality engineer. Osborne stated that in April 1984 he heard that Lavat received a threatening phone call at home and he released Lavat's unlisted phone number and address to the NRC at the NRC's request. He stated that no adverse action was taken against Lavat and the NRC requested no further information concerning Lavat. He stated that the NRC never sanctioned Baldwin for conduct brought to the NRC's attention by Lavat.

Osborne stated that Baldwin hired its document reviewers and quality engineers in compliance with NRC regulations and the standards required by Illinois Power and Baldwin Associates. He detailed the educational requirements for someone in Lavat's position.

Osborne stated that to comply with NRC requirements, Baldwin undertook a 100% audit of its quality assurance inspection employees to verify their educational and experimental requirements. He stated that the audit resulted in the identification of three other individuals who had misstated their educational level, though they each possessed the minimum required educational background for "certification."

He stated that in August 1984 he learned that Lavat did not possess the degrees listed on his resume and therefore could not properly be certified as either a document reviewer or a quality engineer. Osborne stated that Craig Anderson, Lavat's immediate supervisor, advised him Lavat was persisting in his claim that he had the degrees listed on his resume and that, upon Anderson's recommendation, he directed Anderson to fire Lavat for falsification of his employment records.

Attached to Osborne's affidavit were internal documents to Craig Anderson dated August 9, 24 and 31, 1984. The August 31 memorandum was written by Craig Anderson himself as documentation for the files. The letters detailed Baldwin's attempts to verify Lavat's education and Anderson's impression of Lavat's initial response.

Baldwin's motion for summary judgment also included the affidavit of Craig Anderson, who stated that at the time of Lavat's employment he was either Baldwin's manager of quality assurance or manager of quality engineering.

Anderson detailed the applicable American National Standard Institute (ANSI) standards of education required for a person employed in Lavat's position. He stated that the actions taken by Baldwin regarding Lavat "were taken solely to comply with Baldwin quality con-

trol and assurance procedures, ANSI standards and federal regulations."

Anderson stated that the only reason Baldwin undertook a 100% audit of the education and references of Lavat and other document reviewers and quality engineers was to "comply with previous commitments to the NRC regarding verification of employees' references and educational qualifications."

Anderson stated that at the time the audit began he had no knowledge that Lavat had contacted the NRC or expressed concern about the integrity of Baldwin's quality assurance program. Anderson explained that Pamela Jo Dahl, a quality assurance training coordinator, contacted him on or about August 9, 1984, to say she was unable to verify Lavat's college degree or any high school equivalency. He stated that he directed her to pursue verification and that he received a second memorandum from her on August 24, 1984, which detailed her findings.

He stated that he reviewed her two memos and concluded that Lavat neither completed high school nor had the degrees as stated on his resume. American University informed Baldwin Associates that Lavat did not earn a degree from that school but instead he had taken 14 courses over a period of three months. Anderson stated that he believed an associate degree consisted of two years of study with approximately 24 to 28, three-credit-hour courses. Cleveland Institute of Electronics confirmed that it did not award degrees until 1979 and that the only degrees it awarded were associate degrees. Anderson stated that this made Lavat unqualified to be certified as a document reviewer or a quality engineer.

Anderson stated that when he confronted Lavat with this information Lavat admitted that he had not graduated from high school. Lavat told him that his former employer could verify his electrical engineering (EE) degree from Cleveland Institute of Electronics. Anderson stated that Lavat told him his attendance at American University was the equivalent of an "Associate Degree Bachelor Science and Social Sciences." Anderson stated that Lavat insisted that his resume was truthful and never contended that anyone at Baldwin told him to falsify his resume.

Anderson stated that Lavat's previous employer, Daniels International, could not confirm Lavat's electrical engineering degree and Lavat was told August 27, 1984, that he was being fired for falsifying employment records. Lavat then produced proof of a GED certification he obtained nine days before on August 18, 1984; however,

Anderson said he told Lavat that the offer was pointless at such a late date because Lavat had misled Baldwin concerning his resume.

Anderson stated that Lavat was fired for this reason and no other. He also stated that he was not aware of any adverse finding against Baldwin as a result of any condition, incident or discrepancy reported to the NRC by Lavat.

Pamela Jo Dahl swore by affidavit that she was hired by Baldwin to verify the certification of all quality assurance personnel. She stated that at the time she undertook the audit of employees she had no knowledge of Lavat's complaint to the NRC. She stated that she could not verify any college degrees or high school graduation or equivalency for Lavat and therefore determined that Lavat was not properly certifiable as either a document reviewer or quality engineer.

She stated that Cleveland Institute told her it had never issued an electrical engineering degree. She stated that Lavat's previous employer, Daniels International, informed him it "also had questioned Mr. Lavat's EE degree." She stated that Lavat persisted in his contention that his resume was accurate in all respects.

In Lavat's deposition he acknowledged that he had two years of high school and six months at American University, where he thought he received an associate degree. He stated that he had to take a GED examination to get into the American University program; however, all his documentation and proof of his prior education was lost in a hurricane.

He stated that when he was interviewed by a Baldwin employee, the employee urged him to move his Cleveland Institute training from the bottom of his resume to the top to emphasize his electrical training. He stated that before he was fired he was called in and told that he did not have the education to be certified. He stated that he believed he was not fired for his lack of education.

Lavat stated that he called the NRC in April after he received a threatening call at home on a Sunday. He stated that his former girlfriend, who worked on the Clinton construction project, also received threats. He acknowledged that he had emotional trouble during that time and was absent from work on the Monday and Tuesday after the threat. He stated that he suffered two heart attacks brought on by the pressure he experienced at work. He stated that he didn't know who was behind the threats and that after he had some trouble with a subordinate, he demanded to be moved to another area of quality control.

As to the libel action, plaintiff acknowledged that he did not have the document to support the libel claim but contended that the oral

statement or written statement to the Illinois Unemployment Division would be obtained through depositions and subpoenas to the Unemployment Division. Plaintiff stated that he had been told by others, such as "people around town," that he was blackballed in the nuclear industry.

On April 2, 1991, the trial court heard arguments on the summary judgment motion. The court found several of Baldwin's assertions uncontroverted: that plaintiff's employment application was inaccurate; that Baldwin learned of plaintiff's inaccurate resume from a department-wide verification of several hundred employees' employment and educational information; that three other employees admitted they had lied on their resumes and were given a choice of either being fired or resigning; and that plaintiff misstated his background but was not given a chance to resign. The court found uncontroverted plaintiff's assertions that he made a complaint to the NRC, that he was fired four months after he made his complaint to the NRC and that he was not given the option of resigning.

As to the libel count, the court found that the phrase "falsification of employment records" could be innocently construed under the innocent construction rule and therefore was not libel *per se*. The court rejected Baldwin's contention that the communication was privileged saying: "[t]here is absolutely no information contained in the evidentiary material submitted to this court as to why this information was submitted *** therefore, movant has failed to sustain its burden of establishing that the statement was made in connection with the requirements of the act or the regulations thereunder. *** In this case, there is nothing before this case relating to the facts surrounding the making of the statement to the [Unemployment Division]; that is, *** facts as to why it was made, to whom it was made, or under what circumstances it was made. The same is true of the alleged statements to perspective [*sic*] employers. We do not know to whom the statement was made, why it was made, under what circumstances it was made, or even if it was made."

As to the retaliatory discharge claim, the trial court found, in judging the evidence in the light most favorable to the plaintiff, that Baldwin knew of plaintiff's complaint to the NRC at the time it fired plaintiff but that plaintiff was fired after Baldwin conducted a 100% audit of the educational and employment experience of its entire quality assurance department. The court found Baldwin had put forth a legitimate, nonretaliatory and nonpretextual reason for plaintiff's termination and that therefore the burden shifted to plaintiff to come forward with evidentiary material which would show a genuine issue

of fact existed as to defendant's motivation. The court found: "[t]he plaintiff has failed to do so, and his inference is not a rational one, based upon the evidence that he draws it from. He seems to be arguing that because he made a complaint to the NRC, and because he was thereafter fired, he concludes that he was fired because he made a complaint to the NRC." The trial court found that plaintiff failed to put forth any evidence to connect the firing with the NRC inquiry and therefore found the defendant was entitled to judgment as a matter of law on the retaliatory discharge count.

The trial judge then granted the summary judgment in defendant's favor as to count II, the retaliatory discharge count, and count III, a count seeking punitive damages. The court granted partial summary judgment in defendant's favor as to count I, stating "that plaintiff does not have an action for libel *per se* by virtue of the innocent construction rule but denies the motion for summary judgment on count 1 because there are material disputes of fact under libel *per quod*."

On April 12, 1991, defendant moved the court to dismiss the remainder of count I by summary judgment. On April 15, 1991, plaintiff filed a motion seeking leave to file an amended complaint at law *instanter*. Plaintiff's motion was granted and that same day the trial court granted defendant's motion to dismiss plaintiff's second amended complaint by summary judgment and ordered this cause dismissed. Plaintiff appealed.

The standard for granting summary judgment and the standard of review on such judgments is concisely described in *Thompson v. Platt* (1983), 116 Ill. App. 3d 662, 664, 452 N.E.2d 733, where the court stated:

> "Summary judgment is a harsh remedy which is to be avoided in favor of granting the parties an opportunity to present their evidence at trial unless all of the pleadings, depositions, admissions, [and] affidavits, and all permissible inferences, analyzed in the light most favorable to the nonmovant, so clearly favor the movant that no fair-minded person could dispute the movant's right to judgment in his favor. On appeal, this court will affirm the trial court's decision to grant summary judgment only if, after scrutinizing the record, we are absolutely convinced there is no genuine issue as to any material fact and that the movant was, indeed, entitled to judgment as a matter of law." *Thompson*, 116 Ill. App. 3d at 664.

At the pleading stage, plaintiff need only provide some factual basis which would arguably entitle him to judgment to defeat a sum-

mary judgment motion. (*Williams v. Alfred N. Koplin & Co.* (1983), 114 Ill. App. 3d 482, 487, 448 N.E.2d 1042.) But as a general rule, summary judgment is to be encouraged as an aid to the expeditious disposition of a lawsuit. *Reed v. Bascon* (1988), 124 Ill. 2d 386, 393, 530 N.E.2d 417.

The sole function of the court reviewing the trial court's entry of summary judgment is to determine whether the lower court correctly ruled that no genuine issue of material fact had been raised, and if none was raised, whether judgment was correctly entered as a matter of law. *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 938, 453 N.E.2d 1133.

If a genuine issue of material fact exists, a motion for summary judgment may not be granted. (*Fuller,* 117 Ill. App. 3d at 938; see also *Joiner v. Benton Community Bank* (1980), 82 Ill. 2d 40, 44, 411 N.E.2d 229; *Estate of Kern v. Handelsman* (1983), 115 Ill. App. 3d 789, 793, 450 N.E.2d 1286 (summary judgment reversed where court found that facts were not free and clear of uncertainties).) But plaintiff cannot rest on general denials unsupported by any evidentiary facts. Such denials are insufficient to raise a triable issue as against uncontroverted evidentiary matter. *Purdy Co. v. Transportation Insurance Co.* (1991), 209 Ill. App. 3d 519, 529, 568 N.E.2d 318.

First, we address the trial court's dismissal of plaintiff's libel action. The trial judge applied Illinois' innocent construction rule to find that plaintiff's libel action could not stand, relying in part on definitions in *Washer v. Bank of America National Trust & Savings Association* (1943), 21 Cal. 2d 822, 136 P.2d 297. Without addressing the innocent construction rule, we find that the libel action had to be dismissed because Baldwin's communication to the Unemployment Division was privileged.

Section 1900 of the Unemployment Insurance Act states, in pertinent part: "All *** communications *** to the Director *** made in connection with the requirements and administration of this Act *** shall be absolutely privileged and shall not be made the subject matter or basis for any suit for slander or libel in any court of this State, unless the same be false in fact and malicious in intent." Ill. Rev. Stat. 1983, ch. 48, par. 640.

The trial court rejected Baldwin's contention that the communication was privileged and found "absolutely no information contained in the evidentiary material submitted to this court as to why this information was submitted" to the Unemployment Division. The court found Baldwin failed to sustain its "burden of establishing that the statement was made in connection with the requirements of the act or

the regulations thereunder."

■■ We find, however, that the record contains information which supports Baldwin's contention that it forwarded its communication to the Unemployment Division. Lavat concedes this fact in his deposition attached to plaintiff's memorandum in opposition to defendant's motion for summary judgment. Lavat was asked: "Sometime in September 1984 Baldwin Associates advised the Department of Unemployment Insurance Division of the Illinois Department of Labor that you had been discharged for 'falsification of employment records,' is that right?" Lavat responded: "Yes, sir." He was then asked: "That's the basis for your libel action against Baldwin Associates?" And again he responded, "Yes, sir."

Considering the plain language of the statute, information provided by the employer is absolutely privileged unless it is false in fact and malicious in intent. (*Harrison v. Sears, Roebuck & Co.* (1989), 189 Ill. App. 3d 980, 995, 546 N.E.2d 248.) We find plaintiff has not met this burden.

Plaintiff has not established that the communication was false. Both sides acknowledge that the communication to the Unemployment Division occurred and that a privilege attached unless the communication was false and made with malicious intent. Plaintiff acknowledged on appeal that the information on his resume was false. But he contended that his former employer's statement, "falsification of employment records," was not a truthful statement because of plaintiff's subjective belief at the time that he completed the employment records. However, we find plaintiff's subjective belief does not make a false statement true, nor does it become less than false.

Nor has plaintiff established that the communication was made with malicious intent. Actual malice may be found where the person making the communication had reason to believe it was false and failed to investigate further. (*Harrison*, 189 Ill. App. 3d at 995.) Plaintiff does not deny that defendant conducted a thorough investigation into plaintiff's educational background after discovering a problem with his resume. Defendant believed that plaintiff had falsified his employment records at the time it made the communication. Defendant still believes that plaintiff's resume was false and on appeal plaintiff has admitted that the resume is inaccurate.

Plaintiff has established neither falsity nor malice on the part of defendant with regard to the communication to the Unemployment Division.

We find the trial court correctly ruled that nothing in the record supported plaintiff's allegations that Baldwin published this informa-

tion to prospective employers.

We therefore affirm the trial court's dismissal of plaintiff's action, in part for reasons other than those given by the trial judge. A trial court order may be sustained on appeal for reasons other than those relied upon by the trial judge if the conclusion is correct, irrespective of the court's reasoning. *Village of Schaumburg v. Franberg* (1981), 99 Ill. App. 3d 1, 424 N.E.2d 1239.

Next we consider the retaliatory discharge count and whether a genuine issue of material fact exists with respect to the motive of the employer when it fired the plaintiff. To state a cause of action for retaliatory discharge, plaintiff must allege that he was discharged in retaliation for his activities, and that the discharge was in contravention of a clearly mandated public policy. (*Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 505, 485 N.E.2d 372.) The *Wheeler* court stated that the protection of the lives and property of citizens from the hazards of radioactive material is as important and fundamental as protecting them from crimes of violence and that by enacting legislation Congress effectively declared a clearly mandated public policy to that effect. *Wheeler*, 108 Ill. 2d at 511.

Retaliatory discharge is reviewed under a traditional tort analysis, and so to defend against such a charge, an employer must establish that plaintiff was guilty of conduct justifying his discharge. (*Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 812, 537 N.E.2d 1348.) Retaliatory discharge is a proper subject for summary judgment. *La Porte v. Jostens, Inc.* (1991), 213 Ill. App. 3d 1089, 572 N.E.2d 1209.

Baldwin maintains that it fired plaintiff because plaintiff's educational background did not permit him to be certified as a nuclear plant quality assurance employee under NRC regulations and that plaintiff persisted in his contention that his resume was accurate. Both parties agree that Baldwin made a commitment to the NRC in 1982 to verify the education and experience of all its quality assurance employees. Baldwin contends that it discovered plaintiff's lack of education in 1984 when it undertook the promised audit of quality assurance employees.

The trial court found Baldwin had put forth a legitimate, nonretaliatory and nonpretextual reason for plaintiff's termination and that therefore the burden shifted to plaintiff to come forward with evidentiary material that would show a genuine issue of fact existed as to defendant's motivation. The trial court found plaintiff "failed to do so, and his inference is not a rational one, based upon the evidence that he draws it from. He seems to be arguing that because he made a

complaint to the NRC, and because he was thereafter fired, he concludes that he was fired because he made a complaint to the NRC."

Plaintiff contends that the record is replete with evidence from which it can reasonably be inferred that plaintiff was terminated because of his complaint to the NRC. Plaintiff points to the affidavits and depositions of former Baldwin employees who stated that the 100% audit was promised in 1982 with a targeted completion date of February 1983 and yet was not started until after plaintiff filed his complaint with the NRC. Plaintiff contends that the employee affidavits in support of the motion for summary judgment conflict with the documents in the record as to whether the audit began in April or May of 1984.

Lavat argues that three other employees with inaccurate resumes were permitted to resign and he was not. Baldwin responds by stating that the three other employees admitted that they lied whereas Lavat insisted that he was telling the truth.

Lavat argues that further proof that his firing was pretextual comes from Baldwin's personnel manual which states that a person not eligible for hire because he has no high school education or GED can be reconsidered for employment if he or she submits proof of successful completion of this educational requirement. Lavat submitted proof of his GED certification in August 1984 but he was fired nine days later.

Plaintiff cites *Kansas Gas & Electric Co. v. Brock* (10th Cir. 1985), 780 F.2d 1505, where a quality assurance employee was fired when he was not able to provide proof of his educational background within 48 hours. The employee also had filed several reports with his superior detailing potential quality assurance problems. The Tenth Circuit found disparate treatment between the way the plaintiff was treated because the defendant did not fire other employees who failed to verify their backgrounds. Lavat argues that here other employees who admitted they lied were allowed to resign and Lavat, who insisted his resume was truthful, was fired despite the fact that he had proof of a GED completion. Lavat argues further that a material fact exists as to when Larry Osborne learned about his complaint to the NRC.

Lavat also argues that in cases where the plaintiff contends he was fired for filing a Workers' Compensation Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*) claim, the courts have noted that a *prima facie* case of retaliatory discharge can be shown by showing a short time span between the exercise of the employee's rights under the Workers' Compensation Act and the employee's discharge. *Hugo v.*

*Tomaszewski* (1987), 155 Ill. App. 3d 906, 910, 508 N.E.2d 1139; see also *Netzel*, 181 Ill. App. 3d 808, 537 N.E.2d 1348.

Baldwin contends that *Hugo* is factually distinguishable because in that case the employee was discharged immediately upon the employee's return from medical leave following his work place accident prompting his worker's compensation claim. Here, Lavat was fired four months after his contact with the NRC.

■ Baldwin contends that its reason for firing Lavat was not pretextual and was not in retaliation for plaintiff's complaint to the NRC. Baldwin argues that in order to believe Lavat's contentions this court would have to believe that when Baldwin managers learned of Lavat's call to the NRC they "were so upset they devised a scheme to retaliate against him" by auditing approximately 250 quality assurance department employees. But Lavat's contention fails to consider how Baldwin management would know that it would find errors on Lavat's employment application and why it took so long to fire Lavat.

Baldwin notes that it had a stated policy of protecting its employees who took safety concerns to the NRC. Baldwin argues that if it simply wanted to fire Lavat it could have done so when it laid off other workers in June for reasons unrelated to this appeal. Instead, Lavat was transferred to another quality assurance job.

Baldwin contends that it permitted three other employees to resign because they admitted that they had lied. Lavat was fired because he insisted that his resume was accurate, thus continuing to lie even when faced with documentary proof of the false records. Baldwin argues that falsification of employment records is proper grounds for dismissal. *Roundtree v. Board of Review* (1972), 4 Ill. App. 3d 695, 696, 281 N.E.2d 360.

We agree with the trial court's finding that, judging the evidence in the light most favorable to the plaintiff, Lavat's firing was not pretextual and was not in retaliation for his contacting the NRC. We affirm the trial court finding that no genuine issue of material fact exists and the court's order dismissing plaintiff's complaint on Baldwin's motion for summary judgment.

Affirmed.

McNAMARA and RAKOWSKI, JJ., concur.